J-S08036-24

2024 PA Super 72

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KUAMI WRIGHT | : | |
| | : | |
| Appellant | : | No. 124 MDA 2023 |

Appeal from the Judgment of Sentence Entered December 12, 2022
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0004999-2020

BEFORE:   OLSON, J., MURRAY, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED APRIL 15, 2024**

Appellant, Kuami Wright, appeals *pro se* from the judgment of sentence entered in the Court of Common Pleas of Dauphin County following his conviction by a jury on the charges of kidnap to facilitate a felony, robbery, and making terrorist threats.[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: On February 23, 2021, the Commonwealth filed an Information charging Appellant with numerous offenses in connection with the kidnapping of the victim, Desiree Cordle. Kaitlyn Clarkson, Esquire, from the Public Defender's Office entered her appearance on behalf of Appellant; however, at the commencement of the

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2901(a)(2), 3701(a)(1)(iii), and 2706(a)(1), respectively.

jury trial on October 3, 2022, Appellant indicated his desire to proceed *pro se*.

Thus, following a lengthy colloquy, the trial court granted Appellant's request

to proceed *pro se* but appointed Attorney Clarkson as standby counsel.

The trial court has aptly summarized the evidence offered at the jury

trial as follows:

> On the morning of October 15, 2020, Desiree Cordle drove a friend to work and returned to her home at [**] South 16th Street in the City of Harrisburg between 6:30 a.m. and 6:45 a.m. N.T., 10/3-10/5/22, at 115, 117. She parked her Chevrolet Avalanche truck in a church parking lot and began walking the short distance to her house. [*Id.* at] 117-18, 156. A man[, later identified as Appellant,] was walking in her direction [and] met up with her near a telephone pole on a corner. He shook a gun he held near his belt and said, "Let's go." [*Id.* at] 118-19.
>
> The individual ordered Ms. Cordle to take him to an automated teller machine (ATM) and withdraw $600.00 for him. When she informed him that she only had five dollars ($5.00), he told her that she would have to take him to rob someone. [*Id.* at] 119. Ms. Cordle got into the driver's seat of her truck. [*Id.*] The perpetrator, a black man wearing black pants, a black hooded sweatshirt, and a mask that covered his entire face except his eyes, sat in the rear driver's side seat. [*Id.* at] 119-21. He instructed Ms. Cordle precisely where to drive. [*Id.* at] 121.
>
> Eventually, the man told Ms. Cordle to park in an alley near 17th and Chestnut Streets. [*Id.* at 122.] From the rear seat, he began rubbing her back and asked if she was wearing a bra. [*Id.*] When she told him she was not, he ordered her to take off her clothes. [*Id.*] She unsuccessfully pleaded with him "please, please don't." [*Id.*] Ms. Cordle removed all of her clothes, except her panties, which she was allowed to keep on because she told the assailant she was having her menstrual cycle. [*Id.*]
>
> Ms. Cordle was again ordered to drive and was directed to a convenience store on Herr Street. [*Id.* at] 124. At that point, the encounter had lasted approximately twenty (20) to thirty (30) minutes. [*Id.*] Using [an item] Ms. Cordle could not see, but what felt like a sweater or some other article of clothing, the man tied her hands behind her to the seat. [*Id.* at] 125-26. He told her, "I'm not tying you tight so you can get away but remember

- 2 -

that I have the keys to your truck," and then he exited the truck. [***Id.***] He also told her that his intention was to rob the store. [***Id.*** at] 126.

Ms. Cordle decided not to attempt an escape but looked around the area for the police or someone to assist her. [***Id.***] After only one (1) or two (2) minutes, the man returned. He untied one arm so Ms. Cordle could drive and directed her to another alley. [***Id.*** at] 126-28. The individual exited the truck and told Ms. Cordle to open the driver's side door. He ordered her to remove her panties and turn to face him, and Ms. Cordle feared she was going to be raped. [***Id.*** at] 128-30. After taking her wallet and removing her identification, he said, "now I know who you are." [***Id.***] He then spread her legs apart with his hands and asked, "do you like this?" [***Id.*** at 131.] When Ms. Cordle replied that she did not, he told her that "next time it'll be worse" and warned her not to call the police. [***Id.*** at] 128.

During this part of the incident, Ms. Cordle kept looking at the perpetrator's eyes to record a description. He responded that she should not look at him. [***Id.*** at] 132-33.

The man then took the keys to the truck and told Ms. Cordle he was placing them on top of a nearby abandoned vehicle. [***Id.*** at] 128-29. He told her to wait five (5) minutes before leaving. Before fleeing the scene, the man took two (2) crossbows in the back of the truck that belonged to Ms. Cordle's son. [***Id.***] He also took her phone. [***Id.*** at] 133.

Ms. Cordle waited only a few seconds before driving home. [***Id.*** at] 134. She screamed as she entered her house, and at 7:35 a.m., her daughter called 911. [***Id.*** at] 107, 135-36. When the police officers initially arrived shortly thereafter, Ms. Cordle was extremely upset. She was crying and having difficulty answering questions. [***Id.*** at] 110-11. Due to her hyperventilation, she was transported to Harrisburg Hospital. [***Id.*** at] 111-12.

At the hospital, Ms. Cordle was visited by Detective Richard Gibney, the assigned lead detective in the case. N.T., 10/13-10/17/22, at 343-44. Detective Gibney presented Ms. Cordle with a photo array of potential suspects. [***Id.*** at] 347. He did not tell her who the suspect was or if the suspect was even in the array. He only asked if she could identify anyone. N.T., 10/3-10/5/22, at 137. Detective Gibney observed Ms. Cordle examine the array "thoughtfully." She then became visibly upset and, without hesitation, she identified [Appellant from the array]. N.T., 10/13-

- 3 -

10/17/22, at 347-50. Ms. Cordle testified at trial that she "noticed the eyes…[t]he eyes is what set it off." N.T., 10/3-10/5/22, at 137.

Upon her release from the hospital later in the day, Ms. Cordle met with Detective Gibney at the Harrisburg Police Station. [*Id.* at] 138. Since Ms. Cordle kept referring to her assailant's voice, Detective Gibney decided to have her listen to voice samples. N.T., 10/13-10/17/22, at 357. He uploaded a video with [Appellant's] voice from [Appellant's] Facebook page and positioned Ms. Cordle so she could not see the computer screen and identify whose Facebook page it was. [*Id.* at] 358. Detective Gibney testified that he knew the voice on the video belonged to [Appellant] from the image in the video and from his own knowledge of [Appellant's] voice. [*Id.* at] 360.

Upon hitting play on the video, "it was almost instantaneous….[Ms. Cordle] became very emotional, started crying, and basically shaking uncontrollably, and [she] said, "That's him." [*Id.* at] 359. Ms. Cordle testified, "I can't forget it. I don't know what he was saying in the recording, but as soon as they played it, I knew. I knew it was his voice." N.T., 10/3-10/5/22, at 138. Ms. Cordle explained that she was "very certain" of her identification of [Appellant]. [*Id.* at] 148.

Three (3) days later, on October 18, 2020, Nicolas Rivera, the manager of the Capital City Buy and Sell Pawnshop in Susquehanna Township, bought two (2) crossbows and two (2) hoverboards from a familiar customer named Ramon Nunez. [*Id.* at] 198, 204-05. A second individual, a black male with dreadlocks, accompanied Nunez and was unknown to Rivera. [*Id.* at] 210, 214. Surveillance video captured both individuals in the store in possession of the items sold. [*Id.* at] 208-10. Ms. Cordle discovered the crossbows for sale on ebay and notified the police. [*Id.* at] 140.

Ramon Nunez testified that he spoke with the police on October 23, 2020. [*Id.* at] 228. He explained that he knew [Appellant] by the nickname "Good Brother." [*Id.* at] 238. Nunez and [Appellant] were discussing ways to try to make money. [*Id.* at] 231-32. [Appellant] walked away and returned approximately five (5) to ten (10) minutes later with two (2) crossbows. [*Id.* at] 233-34. Nunez and [Appellant] then went to the pawn shop together to sell the crossbows. [*Id.* at] 230-31, 237-38. The crossbows were later positively identified as belonging to Ms. Cordle's son. [*Id.* at] 224.

[Meanwhile,] on October 19, 2020, Officer Justin Taylor encountered [Appellant] as he exited a fried chicken store on Market Street. He was in full police uniform. N.T., 10/13-10/17/22, at 425-28. Two (2) probation officers accompanied him. [*Id.* at] 428-29. Knowing [Appellant] was wanted by the police, Officer Taylor said, "Kuami, come here." [*Id.*] [Appellant] looked up in response and "immediately started running." [*Id.* at] 428.

Upon his arrest and incarceration at Dauphin County Prison, [Appellant] engaged in recorded telephone conversations about his case. He referred to the victim, Ms. Cordle, as "some white woman." [*Id.* at] 377, 391-92. However, neither the criminal complaint nor the probable cause affidavit had specified or referenced Ms. Cordle's race or appearance. [*Id.* at] 374-75. Likewise, the media was not presented with any such information that could [have been] reported. [*Id.* at] 377-78.

[Appellant called witnesses to support his defense theories, as well as testified in his own defense at trial.]

Trial Court Opinion, filed 4/18/23, at 3-7.

At the conclusion of trial, the jury convicted Appellant of the offenses indicated *supra*, and following the preparation of a pre-sentence investigation report, Appellant proceeded to a sentencing hearing on December 12, 2022. The trial court sentenced Appellant to an aggregate of thirty-two years to seventy years in prison. After Appellant indicated he wished to appeal, the trial court appointed Attorney Clarkson to assist Appellant.

On December 20, 2022, Attorney Clarkson filed a timely post-sentence motion on behalf of Appellant, and by order entered on December 23, 2022, the trial court denied the post-sentence motion. This timely, counseled appeal followed. On January 23, 2023, the trial court directed Attorney Clarkson to file a Rule 1925(b) statement on behalf of Appellant. Attorney Clarkson timely

complied on February 10, 2023, raising all of Appellant's issues, and the trial court filed a responsive Rule 1925(a) opinion.

Thereafter, Appellant indicated his desire to proceed *pro se* on appeal, and after the trial court held a **Grazier**[2] hearing on April 18, 2023, the trial court granted Appellant's request to proceed *pro se*.[3]  Accordingly, Appellant has filed a *pro se* appellate brief in which he presents the following issues in his "Statement of Questions Presented" (verbatim):

1. Was the verdict against the weight of the evidence?
2. Did the court err in allowing admission of Wright's prior robbery conviction?
3. Did the court err in questioning a witness with regard to height?
4. Did the court err in failing to suppress the suggestive voice identification?
5. Did the court err in not allowing Wright to recall Commonwealth witness Richard Gibney?
6. Did the court err in sentencing Wright to consecutive sentences?
7. Did the court err in finding this a third strike as Wright had his second strike waived?
8. Did the court err in granting the Commonwealth's objection regarding a double-blind photo array?
9. Did the court err when it did not allow standby counsel to question Wright and the victim?

---

[2] **Commonwealth v. Grazier**, 552 Pa. 9, 713 A.2d 81 (1998).

[3] Apparently out of an abundance of caution, on April 20, 2023, Attorney Clarkson filed in this Court an application to withdraw as counsel on the basis Appellant wished to proceed *pro se* on appeal.  By order entered on April 26, 2023, we denied the application to withdraw as moot.  We specifically noted the trial court previously held a **Grazier** hearing and properly permitted Appellant to proceed *pro se* on appeal.

Appellant's Brief.[4]

Initially, we note that although Appellant presents a litany of issues in his brief, he presents corresponding argument for only issues one, two, three, four, and five. That is, Appellant develops no argument regarding issues six, seven, eight, and nine.

"The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority." *Eichman v. McKeon*, 824 A.2d 305, 319 (Pa.Super. 2003). *See* Pa.R.A.P. 2119 (setting forth requirements for the argument portion of appellate briefs). It is well-settled that "[w]hen issues are not properly raised and developed in briefs, when the briefs are wholly inadequate to present specific issues for review, a court will not consider the merits thereof." *Commonwealth v. Sanford*, 445 A.2d 149, 150-51 (Pa.Super. 1982) (citation omitted). Accordingly, where an appellant fails to provide any discussion of his issue on appeal, or case law supporting his right to relief, this Court will not address the issue on appeal. *See id.*

_____

[4] We note Appellant's brief is partially handwritten and partially typed. The handwritten portion, on which Appellant sets forth his "Statement of Questions Presented," is unpaginated. Further, we note that the order in which Appellant presents his issues in the argument portion of his brief does not correspond with the order in which Appellant sets forth his issues in his "Statement of Questions Presented." However, we shall address Appellant's issues in the order in which they are presented in his "Statement of Questions Presented."

Here, although Appellant lists nine issues in his "Statement of Questions Presented," he has failed to set forth any argument as to issues six, seven, eight, and nine. Further, we note that, inasmuch as Appellant has failed to include a "Statement of the Case" or a "Summary of Argument" in his appellate brief, we have no indication as to the facts or arguments underlying issues six, seven, eight, and nine. *See* Pa.R.A.P. 2117, 2118.

We acknowledge Appellant is proceeding *pro se* in this matter. Although this Court will "liberally construe materials filed by a *pro se* litigant, [an] appellant is not entitled to any particular advantage because he lacks legal training." *Elliot-Greenleaf, P.C. v. Rothstein*, 255 A.3d 539, 542 (Pa.Super. 2021) (citation omitted). It is not our duty or our prerogative to develop arguments for an appellant. Thus, applying our Rules of Appellate Procedure, we find issues six, seven, eight, and nine waived on this basis. *See Sanford*, *supra*.

Turning to Appellant's first issue, Appellant contends the jury's verdict is against the weight of the evidence since the evidence linking him to the crime is inconclusive, questionable, and/or irrational.[5] Specifically, Appellant

_____

[5] Appellant adequately preserved his weight claim in his post-sentence motion. *See* Pa.R.Crim.P. 607. We note that the heading in the argument portion of his brief for this issue is as follows: "The verdict was against the weight of the evidence/There was insufficient evidence for the verdict." Appellant's Brief at 10 (unnecessary bold and underline omitted). However, we remind Appellant that sufficiency and weight claims are clearly distinct. *See Commonwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745 (2000) (discussing the distinctions
*(Footnote Continued Next Page)*

avers Ms. Cordle's pre-trial and in-court identifications of him as the assailant is wholly unbelievable given her assailant was wearing a mask, and, thus, she saw only his eyes during "predawn darkness." Appellant's Brief at 11. Therefore, he contends the jury's verdict based on Ms. Cordle's identification of him "shocks one's sense of justice[.]" ***Id.***

When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." ***Commonwealth v. Talbert***, 129 A.3d 536, 545 (Pa.Super. 2015) (quotation marks and quotation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. ***Commonwealth v. Hopkins***, 747 A.2d 910, 917 (Pa.Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. ***Talbert***, ***supra***.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the

---

between a claim challenging sufficiency of the evidence and a claim the verdict is against the weight of the evidence). "A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." ***Commonwealth v. Charlton***, 902 A.2d 554, 561 (Pa.Super. 2006) (quotation omitted). In any event, a review of the argument section of Appellant's brief reveals he develops an argument solely challenging the weight of the evidence, as opposed to the sufficiency of the evidence.

post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence. *See id.*

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Id.* at 546 (quotation omitted). Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id.* (quotation marks and quotation omitted).

Here, in rejecting Appellant's weight of the evidence claim, the trial court relevantly stated the following:

> The jury found the testimony of the Commonwealth's witnesses credible with respect to the charges [and identification of Appellant]. We agree with the jury's assessment.
>
> [Appellant] focuses on the fact that, according to him, Ms. Cordle could only identify him from his eyes. He is incorrect. She also identified him from his voice and as being a black male. N.T., 10/3-10/5/22, at 120-21, 138. The testimony revealed that Ms. Cordle displayed no hesitation in identifying [Appellant] from either the photo array or the voice sample. N.T., 10/13-10/17/22, at 350, 359. Even if the identification was made from only [Appellant's] eyes, there is nothing disqualifying about such an identification if found persuasive by the finder of fact.
>
> Nonetheless, despite [Appellant's] implicit contention that Ms. Cordle's identification of him must be viewed in a vacuum, that is not how [the trial court] must assess his challenge to the weight of the evidence. [Appellant] ignores the extremely corroborating fact that an acquaintance of his, Ramon Nunez,

turned up in a pawn shop with the crossbows stolen from Ms. Cordle. N.T., 10/3-10/5/22, at 224, 237-38. He ignores the fact that he was with Nunez at the pawn shop and that Nunez testified that [Appellant] gave him the crossbows. [*Id.* at] 230-31, 233-34. He ignores the fact that he ran from the police four (4) days after the incident, demonstrating a consciousness of guilt. N.T., 10/13-10/17/22, at 425-26, 428. He ignores the fact that he described the victim, Ms. Cordle, as "some white woman" on prison phone calls when only the perpetrator of the crimes could know that fact. [*Id.* at] 374-75, 377-78, 391-92.

The jury apparently did not ignore these facts[.] Discerning nothing in the verdict that shocks one's sense of justice, [the trial court] concludes that [Appellant's] weight of the evidence claim is devoid of merit.

Trial Court Opinion, filed 4/18/23, at 11-12 (citations omitted).

We agree with the trial court's sound reasoning, and we find no abuse of discretion in this regard. **Talbert**, **supra**. Simply put, the jury considered the evidence linking Appellant to the kidnapping and robbery at issue. The jury found Ms. Cordle's identification testimony credible while rejecting Appellant's witnesses and defense theories. To the extent Appellant requests that we re-weigh the evidence and assess the credibility of the witnesses, including Ms. Cordle, we decline to do so as it is a task that is beyond our scope of review. **See Commonwealth v. Collins**, 70 A.3d 1245, 1251 (Pa.Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact"). Thus, we find no merit to Appellant's weight of the evidence claim.

In his second issue, Appellant contends the trial court erred in admitting evidence of Appellant's prior robbery conviction. Specifically, Appellant

- 11 -

contends the trial court erred in permitting the District Attorney to cross-examine Appellant's defense witness, Ramon Nunez, about Appellant's prior robbery conviction. Appellant asserts he "objected to this both on the record in open court and off the record at sidebar just prior to its introduction." Appellant's Brief at 8 (citing N.T., 10/13-10/17/22, at 522-24, 613). After a careful review, we conclude this issue is waived.

Mr. Nunez was initially called as a fact witness by the Commonwealth during its case-in-chief. Mr. Nunez offered testimony regarding Appellant giving him the crossbows and then taking them to the pawn shop. N.T., 10/3-10/5/22, at 225-32. Appellant cross-examined Mr. Nunez regarding the events. *Id.* at 247-87. The Commonwealth questioned Mr. Nunez on redirect examination, and Appellant questioned Mr. Nunez on recross-examination. Appellant does not allege that the Commonwealth questioned Mr. Nunez about his prior robbery conviction during this time.

After the Commonwealth rested its case, outside the presence of the jury, Appellant indicated he planned to call Mr. Nunez as a defense witness, and the following relevant exchange occurred:

> [APPELLANT]: I'm calling [Mr. Nunez] as a character witness. His experience with me as an individual.
> THE COURT: You're going to elicit testimony about your character?
> [APPELLANT]: It's because when [the District Attorney]—
> THE COURT: I'm just inquiring.
> [APPELLANT]: Yes, Your Honor.
> THE COURT: If you do—

[APPELLANT]: If I—

THE COURT:--then your character comes in.

[APPELLANT]: My character is going to come in if I'm going to be a witness. I can expound on that. The reason I was trying to do it because earlier in the trial, when I had objected to—when I objected to the playing of certain videos as being assassination of my character and prejudices my character, it was determined that they would be admitted as my character would come into—would come into question. So, I would—I'm—I would use this testimony [from Mr. Nunez] to kind of combat that just to be—just to be kind of be a total opposite. I'm at a loss for words. I'm looking for—but I would contend that since testimony, for lack of a better word, assassinated by character, and it was admitted, that testimony, with regard—

THE COURT: Well, that specific—does [Appellant] have convictions of *crimen falsi* that would be coming in if he chooses to testify?

[DISTRICT ATTORNEY]: He does. He has a theft conviction that will be coming in, and there is also a robbery conviction.

[APPELLANT]: It's—

[DISTRICT ATTORNEY]: There is also a robbery conviction.

[APPELLANT]: It's beyond 10, Your Honor. It can't come in.

[DISTRICT ATTORNEY]: However, it was just actually outside of 10 years from the period of incarceration; however, I think that if we start going into character evidence, that is a different type of story in terms of character evidence.

[APPELLANT]: And with respect—

[DISTRICT ATTORNEY]: I hadn't planned on using the theft charge on him; however, if we start to put Mr. Nunez up as a character witness, I think that opens the door.

[APPELLANT]: With respect to what the Commonwealth thinks and what's established law, the law states it can't be outside of 10 years with respect—

THE COURT: I disagree with your interpretation. If you go with a character witness, she can go outside. The confines of the 10 is only your prior record if you testify for additional *crimen falsi* for the jury to consider with some other factors involved in determination. But once you start going into character, you're going into character because that—let's see where it goes. See what starts to happen.

- 13 -

***

[APPELLANT]: Just for clarification, Your Honor—I'm sorry. Just for clarification, when I do question Nunez, if I don't ask him character questions, the Commonwealth wouldn't be allowed to bring that up; is that correct?

THE COURT: That's correct.

N.T., 10/13-10/17/22, at 521-24.

As is evident, during this initial discussion on the record regarding Appellant's prior robbery conviction, the trial court confirmed that if Appellant's character was not brought into issue, the District Attorney could not introduce Appellant's prior robbery conviction. While the trial court suggested that such evidence may be introduced if Appellant's character was brought into issue, the trial court indicated it would reserve its ruling until Appellant questioned Mr. Nunez. Appellant did not object.

Thereafter, when Appellant questioned Mr. Nunez during the presentation of the defense's case, Mr. Nunez offered character testimony on behalf of Appellant. *Id.* at 610-12. Accordingly, the District Attorney cross-examined Mr. Nunez as follows:

[DISTRICT ATTORNEY]: Sir, you've testified in reference to [Appellant's] character; is that correct?

[NUNEZ]: Yes, ma'am.

[DISTRICT ATTORNEY]: And you testified—I take it that you know other people in the community as well in terms of his—you're indicating in term of his reputation; is that correct?

[NUNEZ]: Excuse me?

[DISTRICT ATTORNEY]: You indicated what you believe his character is?

[NUNEZ]: My judgment of his character, yes.

- 14 -

[DISTRICT ATTORNEY]: Are you aware of—

THE COURT: Let me see you at sidebar.

(A discussion was held off the record at sidebar.)

THE COURT: Proceed, [District Attorney.]

[DISTRICT ATTORNEY]: Thank you, Your Honor. [Mr. Nunez], are you aware of the fact—now, you talked about your feelings, you're aware of the fact that the [Appellant], Kuami Wright, the Good Brother, was charged in 2004 and convicted in 2005 of a robbery?

[NUNEZ]: No, ma'am.  I don't know anything.

[DISTRICT ATTORNEY]: You were not aware of that?

[NUNEZ]: No, ma'am.

[DISTRICT ATTORNEY]: I have nothing further.

THE COURT: Thank you, sir.  You may step down. You are free to go, well, with the Sheriffs. My apologies.

[NUNEZ]: Stop playing with my emotions.

THE COURT: And for that I deeply apologize. Your next witness, [Appellant].

[APPELLANT]: I do believe that was my last witness, Your Honor.

*Id.* at 612-13.

As is evident, Appellant did not lodge an objection on the record upon the District Attorney cross-examining Mr. Nunez regarding Appellant's prior robbery conviction.[6]  It is well-settled that "[i]ssues not raised in the lower

_____

[6] Appellant contends he objected during the sidebar discussion; however, he has not ensured the sidebar discussion was transcribed and provided to this Court.  Thus, this Court cannot consider anything that may have been discussed therein in rendering our decision. *See Commonwealth v. Lopez*, 57 A.3d 74, 82 (Pa.Super. 2012) (noting that "it is an appellant's duty to ensure that the certified record is complete for purposes of review" and whenever "portions of a proceeding are unrecorded, the appellant's burden to
*(Footnote Continued Next Page)*

court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). "[I]t is axiomatic that issues are preserved when objections are made timely to the error or offense." **Commonwealth v. Baumhammers**, 599 Pa. 1, 960 A.2d 59, 73 (2008) (citing **Commonwealth v. May**, 584 Pa. 640, 887 A.2d 750, 761 (2005) (holding that an "absence of contemporaneous objection renders" an appellant's claim waived)). Thus, we find the issue to be waived.

In any event, even if not waived, and assuming, *arguendo*, the trial court should have excluded the Commonwealth's passing reference to Appellant's prior robbery conviction, any error with regard thereto is harmless.[7]

> The harmless error doctrine reflects the reality that the accused is entitled to a fair trial, not a perfect trial. [The Supreme Court has] described the proper analysis as follows:
>
> > Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so

---

supply a record may be satisfied through the statement in absence of transcript procedures").

[7] We note our Supreme Court has held that this Court may *sua sponte* invoke the harmless error doctrine since it "does nothing more than affirm a valid judgment of sentence on an alternative basis." **Commonwealth v. Hamlett**, 660 Pa. 379, 234 A.3d 486, 492 (2020) (quotation marks and quotation omitted).

insignificant by comparison that the error could not have contributed to the verdict.

**Commonwealth v. Hairston**, 624 Pa. 143, 84 A.3d 657, 671 (2014) (quotation marks and quotations omitted).

Here, during his closing argument, Appellant admitted to the jury that he committed a robbery in 2004, and, more specifically, he was convicted of robbing a pizza man with a knife. N.T., 10/13-10/17/22, at 629. However, he urged the jury to find that his prior conviction "wasn't that big" of a deal. **Id.** Accordingly, given that Appellant highlighted his robbery conviction for the jury, any prejudice from the Commonwealth's passing reference was *de minimis*. Thus, Appellant is not entitled to relief on his second issue. **See Hairston**, **supra**, 84 A.3d at 671 ("Harmless error exists if the record demonstrates…the error did not prejudice the defendant or the prejudice was *de minimis*.") (quotation omitted).[8]

_____

[8] Moreover, it bears mentioning the evidence of Appellant's guilt was overwhelming in relation to any prejudice resulting from the Commonwealth's passing reference. The victim, who identified Appellant prior to and during trial as her assailant, testified Appellant forced her into her vehicle at gunpoint, transported her to a secluded spot, ordered her to remove her clothes, and tied her to the seat of the vehicle. He threatened to hurt her if she reported the incident to the police, and looking at her identification, he announced he knew her identity. Appellant eventually left her in her vehicle after taking her phone and crossbows from her vehicle. Appellant, along with Mr. Nunez, sold the crossbows to a pawn shop. Thus, the evidence was so overwhelming as to outweigh any error from the Commonwealth's passing reference to Appellant's prior robbery conviction. **See Hairston**, **supra**.

In his third issue, Appellant contends the trial court erred in questioning

a witness with regard to height. Specifically, Appellant relevantly avers:

> Desiree Cordle testified that she and her assailant were the same height.[9] Appellant in his defense, therefore, sought to establish that he wasn't the assailant as he was five foot ten[10] while Ms. Cordle (and consequently her assailant) was five foot five. Appellant, through testimony elicited from witnesses, had arguably established this fact. [Appellant] then played a video for Harrisburg police lieutenant Kyle Gautsch [during cross-examination]. The surveillance video showed Ms. Cordle and her abductor standing three to five feet apart. Lieutenant Gautsch was then asked if the individuals in the video appeared to be the same height. The lieutenant answered in the affirmative, therefore affirming [Appellant's] assertion that the assailant was five foot five while [Appellant] was five foot ten.[11] On redirect, the Commonwealth sought to disprove this assertion.[12]

---

[9] On cross-examination, Ms. Cordle testified she is 5'5" and, after the incident, she informed the police that the assailant was the same height as her or an inch taller. N.T., 10/3-10/5/22, at 141-42.

[10] There was dispute at trial about Appellant's actual height. Appellant contends on appeal he is 5'10" tall; however, Detective Gibney testified Appellant is 5'9". N.T., 10/13-10/17/22, at 354, 394. In any event, Detective Gibney testified that witnesses' reports of height varies and is often inaccurate. *Id.* at 417.

[11] On direct examination, Lieutenant Gautsch indicated the police could not make an identification of the assailant from the video. N.T., 10/13-10/17/22, at 449. On cross-examination, Appellant asked the lieutenant whether, although "it's kind of hard to tell from this distance, just from them walking across the street, when you look at the frame from this distance, do they appear to be the same height?" *Id.* at 455. Lieutenant Gautsch answered, "They do based upon the video from a distance." *Id.*

[12] Specifically, the Commonwealth asked the lieutenant, "[A]t that distance they appear to be the same height. Is that a fair assessment of height when you're looking at a surveillance video like that?" N.T., 10/13-10/17/22, at 457. In response, Lieutenant Gautsch replied, "[T]hey're pretty far-off in the distance from this camera, as well as you can see from here it's a distance
*(Footnote Continued Next Page)*

> [Appellant] then, on [recross-examination], sought to lock the lieutenant into his previous testimony regarding the height of the individuals in the video.[13] [Appellant] then, satisfied that he had firmly established that the individuals in the video were the same height, ended his questioning[.] The [trial] court then interjected with a series of questions calling into question the reliability of the video depicting the height of the individuals and offering possibilities as to how the assailant could have been taller while appearing shorter.

Appellant's Brief at 6-7 (footnotes added).

Appellant contends the trial court's questioning of Lieutenant Gautsch was improper and prejudicial. Specifically, Appellant challenges the following:

> [APPELLANT]: When you were asked just based on that frame— when you were asked to make a determination, you determined that they appeared to be the same height; is that correct?
>
> [LIEUTENANT GAUTSCH]: An approximation.
>
> [APPELLANT]: Okay. Nothing further, Your Honor.
>
> THE COURT: When you look at that still frame, does it affect you or whatever if one would be closer to the camera or farther away? Would that affect the relative gauging of height?
>
> [LIEUTENANT GAUTSCH]: I mean, I think it could, Your Honor. It depends on the distance. They are pretty distant.
>
> THE COURT: How about strides taken—the width of the stride taken by one? Because if you're standing up, your legs are together, the difference in stride can affect height too.
>
> [LIEUTENANT GAUTSCH]: Right. The longer the stride is, the lower you drop.

_____

and it's pixilated as well. So, are they the same height? I can't say that positively." ***Id.***

[13] On recross-examination, Appellant asked the lieutenant whether he would "generally view that [video] and use that as a determination for height[?]" N.T., 10/13-10/17/22, at 459. Lieutenant Gautsch testified height determinations from the video would be "an approximation." ***Id.*** at 460.

[APPELLANT]: And is it a fair assessment that we saw them walk from one side of the street to the other at a fairly close distance, maybe three feet from each other?

[LIEUTENANT GAUTSCH]: I would say.

[APPELLANT]: So, nothing further, Your Honor.

THE COURT: Thank you, sir. You may step down, and you're free to go.

N.T., 10/13-10/17/22, at 460-61.

Initially, as is evident, Appellant did not object at the conclusion of the trial court's questioning, and he has not otherwise indicated where in the transcript he may have objected. Thus, the claim is waived on this basis. **See** Pa.R.A.P. 302(a). In any event, we conclude there is no merit to Appellant's issue.

We note "[t]he admissibility of evidence is at the discretion of the trial court and only a showing of an abuse of that discretion, and resulting prejudice, constitutes reversible error." **Commonwealth v. Glass**, 50 A.3d 720, 724-25 (Pa.Super. 2012) (quotation and quotation marks omitted).

Regarding a trial judge questioning a witness, we note:

A trial judge must be ever cautious that his questioning of witnesses not show bias or a belief in the credibility of particular witnesses. However, a trial judge has the inherent right, and, at times, the duty to question witnesses to clarify existing facts and to elicit new information. Where these are the objectives of the questioning and it is not unduly protracted or conducted in a biased manner, the trial judge's discretion in questioning witnesses will not be found erroneous.

**Commonwealth v. Hogentogler**, 53 A.3d 866, 880 (Pa.Super. 2012) (quotation omitted).

- 20 -

Here, in addressing Appellant's claim, the trial court indicated the following:

> Lieutenant Kyle Gautsch testified that surveillance video had been obtained from Shalom House capturing the initial encounter between [Appellant] and Ms. Cordle and parts of the conclusion of the encounter. Although Lieutenant Gautsch could not identify [Appellant] from the video, he approximated the assailant and Ms. Cordle to be the same height.
>
> The importance of this evidence to [Appellant] is that Ms. Cordle testified that she is five feet and five and one-half inches (5'5½") and described her assailant as either the same height or potentially as tall as five feet and seven inches (5'7"). [Appellant] cited Dauphin County Prison records to support his claim of being five feet and eleven inches (5'11"),[14] although evidence uncovered that height to be based solely on [Appellant's] self-reporting at the time he was incarcerated. More detailed prison records demonstrated [Appellant's] correctly measured height to be five feet and eight inches (5'8"). Detective Gibney testified that his twenty-one (21) years of experience as a police officer have taught him that witnesses will often be wrong about a suspect's height by several inches.
>
> ***
>
> [The trial court does] not believe [its] questions demonstrated bias nor were the questions unduly protracted. [The trial court] asked two (2) questions. [The trial court] elicited further information regarding the content of the videos that was entirely relevant to the point in issue. If the Commonwealth had asked the same questions, they would have been relevant and admissible. The [trial] court is allowed to ask such questions, and [Appellant] is not entitled to relief simply because he finds the answers contrary to his position. Therefore, [Appellant] is not entitled to relief based upon the [trial] court's questioning of Lieutenant Gautsch.

---

[14] Chief Deputy Warden Lionel Pierre testified the prison system lists Appellant's height as 5'11"; however, the prison photo of Appellant does not support this reported height. N.T., 10/13-10/17/22, at 499-501. Rather, the prison photo shows a height of 5'8" or 5'9" if Appellant's hair is included in the measurement of height. *Id.* at 503.

- 21 -

Trial Court Opinion, filed 4/18/23, at 20-21 (citations to record omitted) (footnote added).

We find no abuse of discretion. The trial court's questioning of Lieutenant Gautsch was intended to clarify information for the jury, was not unduly protracted, and was conducted in a non-biased manner. *Hogentogler*, *supra*. The height of the assailant as compared to the victim was an issue at trial, and the trial court's questioning did not improperly emphasize information not otherwise presented to the jury. Moreover, the jury saw the video during trial, as well as observed Appellant and the victim in the courtroom. Thus, the jury was free to draw its own conclusions regarding the height of the assailant, the height of Appellant, and the height of the victim. Thus, we find Appellant is not entitled to relief on this claim.

Turning to Appellant's fourth issue, Appellant avers the trial court erred in failing to suppress Ms. Cordle's pre-trial identification of Appellant based on her identification of Appellant's voice. Specifically, Appellant contends the method used by the detectives to procure the voice identification from Ms. Cordle was unnecessarily suggestive and unreliable. In support of his issue, Appellant relevantly indicates the following:

> On October 15, 2020, Ms. Cordle was called to the criminal investigation division in Harrisburg, PA, to be interviewed by Detectives Richard Iachini and Richard Gibney. In the course of this interview[,] a single voice clip was played for Ms. Cordle and, after listening to the voice clip, she stated that was the voice of her assailant. The defendant subsequently filed a timely motion

to suppress the voice identification, [and following a hearing on October 3, 2022,] the trial court denied [the motion].[15]

Appellant's Brief at 3 (footnote added).

Appellant contends the detectives' "playing of a single voice clip is equivalent to the showing of a single photograph, which is indisputably a suggestive procedure." *Id.* Thus, Appellant contends the Commonwealth should have been precluded from admitting evidence that Ms. Cordle identified her assailant as Appellant from the voice clip.

In reviewing Appellant's suppression claim, we are mindful that:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

*Commonwealth v. Yandamuri*, 639 Pa. 100, 159 A.3d 503, 516 (2017) (citations omitted).

As the trial court aptly notes, this Court's opinion in *Commonwealth v. Vanderlin*, 580 A.2d 820 (Pa.Super. 1990), is applicable to the within

---

[15] We note the suppression motion is not included in the certified record; however, the transcript from the October 3, 2022, suppression hearing has been included with the certified record.

matter. Therein, the victim was sexually assaulted as she was walking home from work. During the twenty-minute attack, the woman only glanced at her attacker's face, but she remembered the voice of her attacker, which she described as a "scratchy whisper." *Id.* at 822. After the attack, the appellant placed an anonymous call to 911 confessing to the crime. The call was traced to the appellant's apartment complex. A police officer played a copy of the tape recording for the victim, who identified the voice as belonging to her attacker. *Id.* at 823. The police arranged for the tape to be played over the radio and television, and several people advised the police that the voice on the tape belonged to the appellant. *Id.*

The appellant sought to suppress the "one-on-one identification" of the attacker's voice from the tape-recorded confession. Citing to *Commonwealth v. Thompkins*, 457 A.2d 925 (Pa.Super. 1983), this Court in *Vanderlin* noted the factors in *Thompkins* provide the appropriate criteria to determine, under the totality of the circumstances, the reliability of a voice identification, and that such voice identification should only be excluded if it could be shown that the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. This Court relevantly indicated in *Vanderlin*:

> [The appellant] urges that the first identification of the voice on tape on December 8, 1988, was impermissibly suggestive because the tape contained only one voice. [The appellant] contends the identification is therefore akin to a photographic lineup with only one photograph. [The appellant] further maintains that because every subsequent identification of the

voice by the victim was tainted by this first impermissibly suggestive identification, all such subsequent identifications must be suppressed. This would also render inadmissible any potential identification at trial of the voice on the tape.

While [the appellant's] analogy to a photographic lineup with only one photograph is well taken, we nevertheless do not believe it requires suppression of the tape or the identification. In [**Thompkins**, **supra**, this Court] discussed the factors to be considered in making such a determination. Noting that "(t)he essential criteria in determining whether or not evidence of pre-trial identification is admissible is its reliability under all of the circumstances," this Court wrote: The question for the suppression court is whether the challenged identification has sufficient *indicia* of reliability to warrant its admission even though the confrontation procedure may have been suggestive. [**Id.** at] 928[.]

This Court in **Thompkins** then enumerated certain factors which should be considered in deciding whether or not to suppress evidence of pre-trial identifications. They are:…the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. **Id.** In **Commonwealth v. Spiegel**, 457 A.2d 531, 536 (Pa.Super. 1983), [this Court] went one step further, holding that the opportunity of the witness to view the actor at the time of the crime is the key factor in the totality of the circumstances analysis.

In [**Vanderlin**], the Court has before it an audio pre-trial identification, rather than the usual identification of an eyewitness or visual nature. Nevertheless, [this] Court's opinions in **Thompkins** and **Spiegel**, above, are relevant and instructive inasmuch as the same principles must be applied. The victim in the instant case had ample opportunity to listen to her assailant at the time of the alleged crime. She testified that the attack lasted approximately twenty minutes. Additionally, she testified the assailant spoke to her continuously throughout the attack, directing her to do certain things. The evidence clearly established not only that she had ample opportunity to listen to the sound of his voice, but also that her attention was focused on what the assailant was saying to her throughout the attack.

Another factor to be considered, according to ***Thompkins***, is the level of certainty which the victim demonstrated when confronted with the tape recording. We note…the victim's testimony that she "froze" when she first heard the recording, and after asking [the investigator] to play it once again "so she could be sure," the victim stated unequivocally that it was the voice of her attacker.

We must also consider the amount of time which elapsed between the crime and the confrontation. The attack allegedly took place on November 27, 1988. The victim first identified the voice on the tape on December 8, 1988, eleven days later. It is difficult to know just how long is "too long" between a crime and an identification. Nonetheless, this Court does not believe eleven days to be too long a lapse between the alleged attack and the victim's identification of the attacker's voice.

The remaining factor to be considered, under ***Thompkins***, is the accuracy of the victim's prior description of the criminal. It is not clear from the record whether the victim ever gave the police a description of her attacker's voice prior to the identification on December 8, 1988. Nevertheless, in view of the application of all the other ***Thompkins*** factors to the instant case, we believe the victim's identification has "sufficient *indicia* of reliability to warrant its admission even though the confrontation procedure may have been suggestive." ***Thompkins***, 457 A.2d at 928 (footnote and citation omitted). [Further, as indicated] in ***Spiegel***, ***supra***, the opportunity of the witness to view, or in this case hear, the actor at the time of the crime is the key factor in the "totality of the circumstances" analysis.

Against all of the above factors, this Court must now weigh the corrupting effect of the suggestive identification itself. ***Thompkins***, ***supra***. We do not find the corrupting effect of admitting the voice identification is of such weight as to render it inadmissible. The challenged evidence merely connects an anonymous caller with the crime. Alone, it does not connect [the appellant] with the crime. That fact, coupled with what we believe are sufficient *indicia* of reliability surrounding the voice identification, leads us to [affirm the order denying the motion to suppress.]

***Vanderlin***, 580 A.2d at 825-26 (emphasis, quotation marks, quotations, and citations omitted).

In the case *sub judice*, in analyzing Appellant's suppression issue, the trial court made the following factual findings, which are supported by the suppression hearing transcript:

> [W]e find Ms. Cordle's identification of [Appellant's] voice extremely reliable. She was in [Appellant's] presence for approximately forty-five (45) minutes during the incident….Ms. Cordle was conscious and aware the entire time. Furthermore, Ms. Cordle's level of attention was remarkable. She made a conscious effort to try to record a visual identification of [Appellant] in her memory, and we trust that this effort extended to other aspects of the incident as evidenced by her lack of difficulty in recalling the events. Finally, [prior to making a voice identification,] Ms. Cordle [made a] photo identification [of Appellant,] she expressed certainty of her identifications without any hesitation, and [she] made all her identifications on the same day as the incident.

Trial Court Opinion, filed 4/18/23, at 19. ***See*** N.T., 10/3/22 (suppression hearing), at 3-11.

Here, as the suppression court's findings demonstrate, Ms. Cordle had ample opportunity to listen to the sound of her assailant's voice, and her voice was focused on what the assailant was saying to her throughout the attack. ***See Vanderlin***, ***supra***. Furthermore, when confronted with Facebook video containing Appellant's voice, Ms. Cordle had a great level of certainty in identifying the voice as belonging to her assailant. ***See*** N.T., 10/3/22 (suppression hearing), at 9-10 (Detective Iachini testifying Ms. Cordle shook and became teary-eyed upon hearing Appellant's voice and immediately identified the voice as belonging to her assailant).

Additionally, Ms. Cordle listened to the Facebook video "within hours of the actual robbery." *Id. See Vanderlin*, *supra*. The remaining factor to be considered is the accuracy of the victim's prior description of the criminal. Here, while it is not clear whether Ms. Cordle gave the police a description of her assailant's voice prior to making the identification from the Facebook video, the record reveals Ms. Cordle identified Appellant's photo from a photo array prior thereto. In any event, in applying the *Thompkins* factors as discussed in *Vanderlin*, we conclude the trial court did not err in holding Ms. Cordle's voice identification has "sufficient *indicia* of reliability to warrant its admission even though the confrontation procedure may have been suggestive." *Vanderlin*, 580 A.2d at 825 (quoting *Thompkins*, 457 A.2d at 928). Here, the opportunity of the victim to hear her assailant at the time of the crime is a key factor in the totality of the circumstances analysis. *See Vanderlin*, *supra*.

Against the above factors, we weigh the corrupting effect of the suggestive identification itself. *Id.* We do not conclude the corrupting effect of admitting the voice identification is of such weight as to render it inadmissible. *Id.* There is no indication that the Facebook video, from which Ms. Cordle identified her assailant's voice, had any connection to the crime or included any kind of confession from Appellant. Alone, the Facebook video does not connect Appellant to a crime. Based on this fact, as well as the sufficient *indicia* of reliability surrounding the voice identification, we conclude

the trial court did not err in denying Appellant's motion to suppress Ms. Cordle's voice identification. *See id.* Thus, Appellant is not entitled to relief on this claim.

In his fifth issue, Appellant contends the trial court erred in not allowing him to recall Commonwealth witness, Detective Richard Gibney, as a defense witness. We find this issue to be waived.

As the trial court notes, Appellant never subpoenaed Detective Gibney to testify as a defense witness; but rather, Appellant requested the trial court order that Detective Gibney, who testified earlier during the Commonwealth's case-in-chief, be available to testify for Appellant as a defense witness. *See* Trial Court Opinion, filed 4/18/23, at 25 n.6. The trial court declined Appellant's request. *See id.*

In his appellate brief, Appellant presents a one paragraph undeveloped argument raising the "queer quality of the court's decision[.]" Appellant's Brief at 12. Appellant has neither cited to authority nor provided references to the record. *See* Pa.R.A.P. 2119(b), (c). Simply put, Appellant's undeveloped argument impedes meaningful appellate review. As indicated *supra*, it is not our prerogative to develop issues for an appellant. Thus, we find Appellant's fifth issue waived on this basis. *Sanford*, 445 A.2d at 150-51 (holding appellate courts will not consider the merits of undeveloped issues).

For all of the foregoing reasons, we affirm.

Affirmed.

Judge Murray joins the opinion.

Judge Olson concurs in the result.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>04/15/24</u>