J-S40034-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES HAINES | : | |
| | : | |
| Appellant | : | No. 2815 EDA 2023 |

Appeal from the Judgment of Sentence Entered August 11, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003226-2020

BEFORE: STABILE, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY LANE, J.:               **FILED FEBRUARY 24, 2025**

James Haines ("Haines") appeals from the judgment of sentence imposed following his convictions of first-degree murder, conspiracy to commit first-degree murder, criminal solicitation to commit first-degree murder, and criminal use of a communication facility.[1]  We affirm.

The trial court summarized the factual background of this matter:

On February 17, 2020, at approximately 3:00 p.m., police responded to a radio call for a shooting on the 3700 block of North Bouvier Street, Philadelphia.  Upon arrival, the police found the decedent, Kristian Eldrige [("Eldridge")], unresponsive and laying on the sidewalk.  Police proceeded to pick up Eldridge, put him in the back of a patrol car and drive him to the hospital, where he was pronounced dead at 3:39 p.m. that afternoon.  [The] medical examiner[] concluded that the death was a homicide caused by a gunshot wound to the chest.

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 903(c), 902(a), 7512(a).

After an extensive investigation, Philadelphia Police detectives determined that Aaron Page [("Page")] shot and killed Eldridge, and that Page was driven to and from the shooting by Edwin Martinez [("Martinez")]. On June 18, 2020, as the police were attempting to execute a warrant for the arrest of Page, he barricaded himself inside his apartment and committed suicide. Following Page's suicide, the police obtained a search warrant for his home and found his phone. After obtaining a search warrant for Page's phone, the police found numerous messages between [Haines] and Page plotting Eldridge's murder. Specifically, Page and [Haines] discussed details of the murder plot, which included Eldridge's location, pictures of Eldridge, a description of Eldrige's minivan, as well as Page's fee for the murder. Thereafter, the police arrested [Haines] at his home in Warrington, Pennsylvania, on July 29, 2020.

Trial Court Opinion, 1/22/24, at 4 (record citations omitted).

Prior to trial, the trial court considered several motions relevant to our decision. The court reserved decision on Haines' motion *in limine* to preclude Philadelphia Police Detective Robert Daly ("Detective Daly") from interpreting vernacular and code terms used by Haines and others in text messages, ruling that the Commonwealth would have to demonstrate Detective Daly's qualifications as an expert on that subject at trial. **See** N.T., 8/8/22, at 21-27. The court granted the Commonwealth's motion to admit evidence pursuant to Pa.R.E. 404(b) related to Page's non-fatal shooting of Kevin Ortiz ("Ortiz") at Haines' direction, approximately four hours after Eldridge's murder. **See id**. at 28-36. The court granted in part the Commonwealth's motion *in limine* to introduce a portion of a YouTube video of Haines rapping under his nickname "Crakk." **See id**. at 37-48. The court concluded that the identified portion of the lyrics sufficiently mirrored the charged criminal conduct and was not overly prejudicial but that the Commonwealth would

- 2 -

have to first authenticate the voice on the video as belonging to Haines. *See id*. at 45-47.[2]

At the jury trial, the trial court qualified Detective Daly as "an expert in the field of vernacular used in criminal transactions in the City of Philadelphia." N.T., 8/9/22, at 141, 143. During his testimony, Detective Daly offered his interpretation of the meaning of numerous slang terms used in text messages and other communications between Haines and others. In addition, the court concluded that the Commonwealth adequately authenticated Haines' voice and permitted the Commonwealth to play the rap video and display a transcription of the lyrics to the jury. *See* N.T., 8/10/22, at 91.

Ultimately, the jury convicted Haines of the above-referenced offenses. The trial court imposed the sentence of life imprisonment without the possibility of parole, followed by an aggregate term of twenty-three years and six months to forty-seven years' imprisonment.[3] Haines filed a timely post-sentence motion raising, *inter alia*, an argument that the verdict was against

---

[2] The video displayed only a still image of an unidentifiable hooded figure, which the parties agreed to show to the jury. *See* N.T., 8/8/22, at 47-48; *see also* N.T., 8/9/22, at 94-95.

[3] The trial court did not impose a sentence on Haines' criminal solicitation conviction. *See* 18 Pa.C.S.A § 906 (stating that "[a] person may not be convicted of more than one of the inchoate crimes of criminal attempt, criminal solicitation or conspiracy for conduct designed to commit or to culminate in the commission of the same crime"); *see also Commonwealth v. King*, 234 A.3d 549, 569-70 n.17 (Pa. 2020) (clarifying "that the term 'convicted' in Section 906 refers to the entry of a judgment of sentence, not a finding of guilt by the jury").

the weight of the evidence. The trial court denied the motion. This timely appeal followed.[4] Both Haines and the trial court have complied with Pa.R.A.P. 1925.

Haines presents the following issues for our review:

[1.] Was the evidence insufficient to sustain the guilty verdicts for conspiracy to commit [first-degree murder, first-degree murder], and criminal solicitation ([ to commit first-degree murder]):

A. Conspiracy to commit [first-degree murder]: there was no direct evidence that [Haines] agreed with others to commit an intentional killing, and the text messages introduced did not prove any agreement to commit murder.

B. [First-degree murder]: there was no evidence [Haines] caused the death of the decedent, that he was even present during the shooting, or that he committed an intentional killing.

C. Criminal solicitation ([first-degree murder]): there lacked evidence that [Haines] commanded, encouraged or requested anyone to commit murder?

[2.] Were the verdicts against the weight of the evidence for all of the offenses as the evidence was that two others committed the murder, [Haines] was not present and no cellular or other forensic evidence tied [Haines] to the crime scene, and [Haines'] purported

_____

[4] Haines' trial counsel filed an initial, timely notice of appeal, but trial counsel did not file a Pa.R.A.P. 1925(b) concise statement as directed by the trial court and instead sought leave to withdraw in this Court. We granted trial counsel's withdrawal and remanded for the trial court to determine the status of Haines' representation. Haines retained counsel ("first appellate counsel"), who failed to file an appellate docketing statement, and this Court dismissed Haines' prior appeal. First appellate counsel then filed a petition under the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-9546, seeking the reinstatement of Haines' direct appeal rights. The PCRA court granted the petition and ordered the withdrawal of first appellate counsel. Haines' current counsel then entered an appearance and filed this timely notice of appeal.

text messages did not establish he commanded, encouraged or requested anyone to commit murder?

[3.] Did the trial court err in permitting Detective Robert Daly's expert testimony in "the field of vernacular used in criminal transactions in the city of Philadelphia," which is not an accepted area of expertise as it is a non-existent field with no scientific community. Additionally, "vernacular used in criminal transactions" is too broad and vague.

Even if this were an actual field of expertise, Detective Daly is not a qualified expert. Detective Daly does not possess the scientific, technical, or other specialized knowledge and uses no methodology that is generally accepted in the relevant field. Detective Daly's lack of methodology cannot be assessed for its reliability. Did this testimony violate the **Frye** standard?[5]

[4.] Did the trial court err by allowing a rap video and lyrics into evidence as their authorship was not established and therefore not properly authenticated. The video was inflammatory, unfairly prejudicial and unconnected to these charges.

Even if properly authenticated, the trial court erred by allowing it into evidence on the eve of trial, which ambushed the defense, and as it was proffered as voice identification of [Haines], its last moment disclosure was a discovery violation that denied the mounting of a defense?

[5.] Did the trial court err in allowing the introduction at trial the evidence of other shootings and a video of a shooting as it was unfairly prejudicial and unconnected to this matter?

Haines' Brief at 9-10 (issues reordered for ease of disposition).

In his first issue, Haines challenges the sufficiency of the evidence with respect to his first-degree murder, conspiracy to commit first-degree murder, and criminal solicitation to commit first-degree murder convictions.

Our review of a sufficiency claim is well settled:

_____

[5] **See Frye v. United States**, 293 F. 1013 (D.C. Cir. 1923).

Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the factfinder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the factfinder.

***Commonwealth v. Scott***, 325 A.3d 844, 849 (Pa. Super. 2024) (citation and brackets omitted, and italicization added).

The elements that the Commonwealth must prove to sustain a conviction for first-degree murder are: (1) the unlawful killing of a human being; (2) that the defendant was responsible for the killing; and (3) that the defendant acted with malice and a specific intent to kill. ***See Commonwealth v. Ballard***, 80 A.3d 380, 390 (Pa. 2013). A killing is with specific intent if it is a "willful, deliberate, and premeditated killing." 18 Pa.C.S.A. § 2502(d). "Premeditation and deliberation exist whenever the assailant possesses the conscious purpose to bring about death." ***Commonwealth v. Hitcho***, 123 A.3d 731, 746 (Pa. 2015) (citation omitted).

With respect to accomplice liability, our Supreme Court has explained:

[A]n individual may be held criminally liable for the acts of another, including first-degree murder, as an accomplice. In order to sustain a conviction based on accomplice liability, the Commonwealth must demonstrate that an individual acted with

- 6 -

the intent of promoting or facilitating the commission of an offense and agrees, aids, or attempts to aid such other person in either planning or committing that offense. [A] shared criminal intent between the principal and his accomplice may be inferred from a defendant's words or conduct or from the attendant circumstances.

*Commonwealth v. Le*, 208 A.3d 960, 969 (Pa. 2019) (citations omitted). However, "a defendant cannot be convicted of first-degree murder under a vicarious liability theory, such as accomplice or conspiratorial liability, unless the fact-finder determines, upon proof beyond a reasonable doubt, that the defendant personally harbored a specific intent to kill." *Commonwealth v. Smyrnes*, 154 A.3d 741, 746 (Pa. 2017).

To sustain a conviction for conspiracy,

the Commonwealth must prove: (1) the defendant intended to commit or aid in the commission of the criminal act; (2) that the defendant entered into an agreement with another to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. As it is often difficult to prove an explicit or formal agreement, the agreement generally is established via circumstantial evidence, such as by the relations, conduct, or circumstances of the parties, or the overt acts on the part of co-conspirators. In the case of a conspiracy to commit homicide, each member of the conspiracy may be convicted of first-degree murder, regardless of who inflicted the fatal wound.

*Le*, 208 A.3d at 969 (citations omitted).

To prove the offense of criminal solicitation, the Commonwealth must show that the accused, with the intent to promote or facilitate a crime, "commands, encourages or requests another person to engage in specific conduct which would constitute such crime or an attempt to commit such

- 7 -

crime or which would establish his complicity in its commission or attempted commission." 18 Pa.C.S.A. § 902(a).

In his challenge to the sufficiency of the evidence for his convictions of first-degree murder, conspiracy, and criminal solicitation, Haines does not contest the proof as to Eldridge's unlawful killing, nor Page's and Martinez's roles in the murder. Instead, Haines argues that the Commonwealth presented insufficient evidence to establish his role in the murder and his specific intent to kill Eldridge, where the Commonwealth did not show Haines' direct involvement with the killing. Haines avers that his mere "association with a 'hit-man' [did] not make [him] a murderer." Haines' Brief at 46.

Haines contends that the evidence was insufficient as to his conspiracy conviction where the Commonwealth only showed "a mere suspicion or a possibility of [his] guilty collusion" with Page and Martinez through "text messages alone, with no clear proof of any agreement." *Id*. at 45. Haines further asserts that the conspiracy evidence was insufficient, where the Commonwealth did not prove payment for the murder with "any actual evidence." *Id*. Finally, Haines maintains that the "nonsensical [text] messages sprinkled with street-talk" were insufficient to prove that he commanded, encouraged, or requested Eldridge's murder, which was necessary to sustain his criminal solicitation conviction. *Id*. at 47.

In its opinion, the trial court comprehensively reviewed the text messages and other communications between Haines and Paige that showed Haines' responsibility for the killing of Eldridge:

- 8 -

Text messages between [Haines] and Page, found in Page's phone, established that [Haines] initiated the murder for hire plan against Eldridge and his associates. On February 13, 2020, four days before Eldridge's murder, [Haines] texted Page that he had "a move" that would make the two men money. Detective [] Daly[] interpreted texts between the two men to mean that [Haines'] "move" was an attempt to take over a block.

Text messages between Page and [Haines] also established that [Haines] was instrumental in organizing and orchestrating the murder for hire plot. Specifically, text messages between [Haines] and Page in the days leading up to Eldridge's murder chronicle Page's surveillance of Eldridge and his associates. During this exchange, which began on February 13, 2020, Page and [Haines] exchanged texts regarding the vehicles used by Eldridge and his associates and whether those vehicles were present at the location Page was surveilling. Page, investigating Eldridge's location, sent [Haines] a screenshot of Eldridge, which was taken from a woman's Instagram live [post]. Page told [Haines] that Eldridge and his associates were at the same location as the woman from Instagram. Page then asked [Haines] for photos of his targets because he was sending a woman into the location he was surveilling. [Haines] sent Page a screenshot of a photo from Eldridge's Instagram profile of Eldridge and [Kareem] Rowlak [("Rowlak")]. Page and [Haines] further discussed what Eldridge's associates were wearing and the cars Eldridge and his associates drove.

Forty minutes after Page told [Haines] that he was sending a woman into the location, Page sent [Haines] a screenshot of a text exchange he was having with a woman [who confirmed that] Eldridge and his associates were inside [that location. Haines] responded to Page's screenshot by stating that the men were likely inside lying low and unarmed.

Later that night, at 10:35 p.m. on February 13th, Page sent [Haines] another screenshot of his text exchange with [the woman who told] Page that Rowlak was wearing a black and red hat and a black hoodie. Page circled this information when he sent the screenshot to [Haines. Haines] responded to the screenshot of the conversation between Page and [the woman] with a message stating "Lay up," which [Detective Daly] interpreted to mean "[a]n easy score . . . synonymous with an easy bucket, an easy shooting." Page then notified [Haines] that [the woman] had identified all four men inside and asked the color of Eldridge's

minivan. [Haines] responded that Eldridge drove a blue van and expressed excitement that all targets might be in the same car. Page expressed worry that law enforcement was parked nearby but nonetheless stated "[t]his gone be sweet."

After an eighteen-minute lull in text messages, [Haines] checked to see if Page was alright, and Page responded that he and Martinez were waiting next to Eldridge's van. [Haines] then notified Page about a shooting that had occurred around the corner from where Page was waiting, which [Haines] had seen on the Citizen app. Page responded, "[F]uck that I'm hitting [them]." When [Haines] asked if Page was fed up, Page responded "And broke."

About forty minutes later, Page again texted [Haines] and told him that Eldridge, [] Rowlak, and [two other associates of Eldridge identified as Stogs and] Reek were at the location Page was surveilling. [Haines] asked if Eldridge's group had left, and Page responded that one of [the woman's] friends exchanged phone numbers with Stogs and was texting him. [Haines], expressing disappointment that Page had missed his targets, said "next time they in there I'm coming down myself I knew they was in there." Page told [Haines] that there was nothing he could have done, and [Haines], boasting about his skills at surveillance, told Page that, had [Haines] been there, they would have surprised the targets blocks away from the surveilled location. [Haines] told Page that Page had come close to completing a $20,000 job.

Approximately two hours later, around 2:10 a.m. on February 14, 2020, [Haines] sent Page a screenshot of an announcement for a party at the Red Wine Bar [] on February 16th and stated that all the targets would be there that night.

On February 16, 2020, the night of the party at the Red Wine Bar, Page texted [Haines] that he was going to "cook" Stogs. [Haines] replied that he hated Stogs and that "stogs gotta go." Page responded that he also did not care for Stogs, he could make it to Stogs' presumed location, and that he was about "to go see wassup." Page and [Haines] then discussed what kind of car Stogs drove as Page surveyed the area. However, despite Page circling the block thirty times, Page was unable to find Stogs or the other targets. [Haines] responded that he did not know what Stogs was currently driving but knew about a van. Page then asked [Haines] if he knew anyone at the party and [Haines] stated he would check. [Haines] then suggested looking for a convertible because

Elridge and his associates had previously driven one instead of their own cars. Page told [Haines] that he had been looking for that vehicle too.

Roughly ten minutes later, at 1:07 a.m. on February 17, 2020, Page texted [Haines] "See anything or hear anything." [Haines] replied that he had not heard anything and that none of the targets were posting information to social media. [Haines] and Page then discussed the social media posts of the target group. Page then told [Haines] that he was going to get a social media password from a third party who followed people on social media whom [Haines] did not follow. Page and [Haines] then expressed frustration that they could not confirm the presence of the targets. The event ended without Page seeing any of the targets.

The following afternoon, at approximately 1:00 p.m. on February 17th, [Haines] sent Page a picture of a van and stated, "Stogs and his brova be driving dis." [Haines] told Page that his "cuz" saw Stogs' brother with the van at a mechanic's shop. Page told [Haines] that he had not seen the van during his prior surveillance. Page asked if [Haines] thought the van was still at the shop, but [Haines] was unsure.

At 3:10 p.m., just minutes after police received the radio call about Eldridge's shooting, Page texted [Haines] "Boy Boy," which was Eldrige's nickname, and [Haines] responded "5." Approximately twenty minutes later, [Haines sent] Page a voice message in which [Haines] stated that "If y'all in a black Nissan with Jersey tags, get up out of that." Detective Daly testified that a 911 caller had referenced a black Nissan sedan as potentially being involved in the shooting.

In addition to the compelling text message evidence described above, there was also evidence of [the non-fatal] shooting [of Kevin Ortiz] that [Haines] and Page planned contemporaneously with Eldridge's murder and executed just hours later. . . . [Haines] and Page used similar tactics, language, and techniques in setting up Ortiz's shooting, and compelling evidence pertained to both shootings.

Ortiz was shot near 7th and Venango Streets around 7:13 p.m. on February 17, 2020, just hours after Eldridge was shot. During the lead up to Eldridge's murder, [Haines] and Page made reference to 7th Street. Less than an hour after Eldridge's murder, Page sent [Haines] a text stating, "I need 7st bro." As

- 11 -

they had done with the surveillance of Eldridge and his associates, [Haines] and Page exchanged text messages regarding Page's surveillance of the area. After exchanging several texts about whether the target was on location, [Haines] sent Page a text with a screenshot of a text message conversation [Haines] was having with a third person. In [Haines'] conversation with the third person, the third person identified someone in a blue sweatshirt and orange sneakers. [Haines] then texted Page that the target was on the right side of Venango Street between Marshall and 7th Streets. Page got into position. At 7:13 p.m., Page texted [Haines] "Kevin love double double I love basketball." [Detective Daly] testified that in this context the reference to basketball player Kevin Love and the basketball term "double-double" was a reference to completing two shootings in one day. Police responded to the Ortiz shooting at approximately 7:13 p.m.

Additionally, there was also evidence of [Haines'] payment to Page. On February 17, 2020, at approximately 11:20 p.m., just hours after Eldridge's murder and Ortiz's shooting, [Haines] texted Page that he was having issues obtaining full payment for the shootings from another party. [Haines] told Page he was going to meet with the other party that night. Page told [Haines] that he would be awake and to let him know the results of the meeting. Three hours later, at approximately 2:40 a.m. on February 18, 2020, [Haines] texted Page "Mad ashit just getting in da crib." Fifteen minutes later, at approximately 2:55 a.m., two photos of [Haines] holding a large sum of money were saved to [Haines'] cellphone.

The next morning, at around 8:30 a.m. on February 18th, Page and [Haines] set up a meeting at Penn Presbyterian Hospital at 51 North 39th Street. An hour later, Page let [Haines] know he was there. Cell site analysis of the phone number associated with Page and the phone number associated with [Haines] placed both phones in the area of Penn Presbyterian Hospital between 9 a.m. and 10:30 a.m. on February 18, 2020. At approximately 10:55 a.m., Page texted [Haines] that [Haines] gave him too much. [Haines] then confirmed he gave Page too much and explained that he did not count it all the previous night because he was tired and that he did not have time to count it that morning. Videos found in Page's cell phone extraction showed that on February 18th, after the meet at Penn Presbyterian Hospital, Page had a large sum of money covering the bed in his bedroom.

The Commonwealth also presented circumstantial evidence of consciousness of guilt. Two hours after the shooting [of Eldridge], Page asked [Haines] what he thought the hospital looked like. [Haines] stated that many people were likely at the hospital and that his name was likely to come up amongst those at the hospital.

In March of 2020, a month after Eldridge's death, [Haines] expressed to a contact saved in his phone as "B" his desire to move down south. When "B" asked where [Haines] planned on moving, [Haines] stated that he was planning on moving to North Carolina because he could not get comfortable as people were saying that he had gotten Eldridge murdered.

On June 18, 2020, the date that Page committed suicide, [Haines] sent a group text to contacts saved as "Bro," [a number Detective Daly testified belonged to Haines' brother,] "Na," and "Boob" notifying them that police were at Page's house. During that text conversation, [Haines] sent the group a message stating that Page's phone was likely tapped. [Haines'] brother asked why [Haines] believed that Page's phone was tapped and then stated that police were likely to go through Page's phone now. [Haines] replied that Page's girlfriend believed that police listened to many conversations and that police had removed the dashboard of the rental car Page used during the murder to obtain location data. [Haines] speculated that Page's "man" had to be cooperating with police because nobody else knew that Page was in the car searched by police. The contact listed as "Na" speculated that another possible cooperator was "Kour." However, [Haines] stated that Kour did not know anything including whom Page was with. Na responded that Kour knew details when Na spoke to him. [Haines] expressed surprise because [Haines] had not told Kour anything.

On July 18, 2020, [Haines] and Page's father exchanged text messages. Page's father let [Haines] know that he had talked to someone who "know[s] a few people" and that Page's case was "locked" because someone was cooperating with police or was an informant. Page's father warned [Haines] to be careful. [Haines] concluded that police were "on some crafty shit," were likely tapping phones, and that he would meet with Page's father in person.

Trial Court Opinion, 1/22/24, at 7-17 (record citations and footnotes omitted).

The trial court found that the "overwhelming evidence" — that Haines "initiated the plan to kill Eldridge, assisted Page in finding Eldridge, assisted Page and Martinez in getting away from the crime scene, and paid Page for the hit" — was sufficient to sustain the convictions for first-degree murder, conspiracy, and criminal solicitation. *Id*. at 17; *see also id*. at 18-19. The court further determined that the evidence established Haines' specific intent to kill where Haines initiated and assisted in bringing about Eldridge's murder, because "[o]bviously, a planned 'hit' for money is an intentional killing." *Id*. at 17.

Viewing the evidence in the light most favorable to the Commonwealth, we conclude that the record supports the trial court's determination that the evidence was sufficient to prove Haines' guilt of first-degree murder, conspiracy, and criminal solicitation. *See Scott*, 325 A.3d at 849. The Commonwealth presented ample evidence showing Haines' responsibility as an accomplice for the unlawful killing of Eldridge, where Haines initiated the plan to kill Eldridge, assisted Page in the surveillance of Eldridge and his associates, and then paid Page afterward for the killing. *See Ballard*, 80 A.3d at 390; *see also Le*, 208 A.3d at 969. The Commonwealth proved that Haines acted with the specific intent to kill by showing that he and Page willfully and deliberately plotted Eldridge's death over the course of multiple days. *See Hitcho*, 123 A.3d at 746. Furthermore, the evidence was sufficient to sustain the conspiracy and solicitation convictions based upon the proof of the agreement that Page would kill Eldridge in exchange for Haines' payment of

- 14 -

money and the numerous overt acts taken in furtherance of the criminal agreement, culminating in Eldridge's killing. *See* 18 Pa.C.S.A. § 902(a); *see also Le*, 208 A.3d at 969.

Contrary to Haines' argument, the Commonwealth did not merely show Haines' "association with a 'hit-man,'" but rather that Haines and Page closely cooperated over multiple days in a scheme to bring about the death of Eldridge and his associates. Haines' Brief at 46. Furthermore, the evidence against Haines not only consisted of "nonsensical [text] messages sprinkled with street-talk," but also included voice messages, social media screenshots, photographs and videos of Haines and Page with the cash payment for the killing, cell-site records, and a YouTube video of Haines rapping lyrics that closely resembled the real-life events of this case.[6] Haines' Brief at 47. We therefore find that Haines' first issue merits no relief.

In his second issue, Haines argues that the trial court abused its discretion in denying his claim that the verdict was against the weight of the evidence.

We review a challenge to the weight of the evidence according to the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of witnesses." *Commonwealth v. Clemens*, 242

---

[6] We discuss the YouTube rap video in more detail *infra* at Haines' fourth issue.

A.3d 659, 667 (Pa. Super. 2020) (citation omitted). For an appellant to prevail on a challenge to the weight of the evidence, the evidence must be "so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Commonwealth v. Delmonico*, 251 A.3d 829, 837 (Pa. Super. 2021) (citation omitted).

"Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence." *Id*.

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Wright*, 314 A.3d 515, 524 (Pa. Super. 2024) (citation omitted).

Haines argues that the verdict was against the weight of the evidence where there was conclusive evidence that Page and Martinez committed the murder of Eldridge, but the record lacked any evidence placing him anywhere near the crime scene. Haines further attacks the credibility of Detective Daly's expert testimony regarding the vernacular terms used in text messages between Haines, Page, and others. Haines avers that, excluding Detective

Daly's questionable interpretation of the messages, "the Commonwealth's theory of its case against [Haines] was held together by complete speculation." Haines' Brief at 42.

The trial court rejected Haines' weight-of-the-evidence claim, reasoning as follows:

> The evidence presented at trial of [Haines'] guilt was not so tenuous, vague, and uncertain that the verdict shocked the conscience. [T]here was overwhelming evidence that [Haines] initiated a murder for hire scheme, in which he enlisted Page and Martinez, against Eldridge and his associates. Contrary to [Haines'] claim, [Haines'] texts clearly established that [he] commanded, encouraged, or requested that Page kill Eldridge and that [Haines] was engaged in a conspiracy with Page to kill Eldridge and his associates. While [Haines] is correct that there was no evidence he was at the scene of the shooting, his coconspirators, Page and Martinez, were successful in carrying out the murder of Eldridge with vital assistance from [Haines]. Since [Haines] is guilty of first[-]degree murder due to his role in the conspiracy, it is of no moment that [Haines] was not at the scene and that [Haines'] coconspirators were present. Accordingly, no relief is due.

Trial Court Opinion, 1/22/24, at 19-20 (citations omitted).

Based on our review, we discern no abuse of discretion by the trial court in rejecting Haines' weight claim. *See Delmonico*, 251 A.3d at 837. The jury had the exclusive province to believe all, part, or none of the evidence presented, and to make credibility determinations regarding the testimony at trial, including the expert opinion offered by Detective Daly. *See Clemens*, 242 A.3d at 667. Additionally, because the trial court had the opportunity to hear and see the evidence presented, this Court gives the gravest consideration to the findings and reasons advanced by the court when

- 17 -

reviewing its determination regarding the weight of the evidence. *See Wright*, 314 A.3d at 524. We decline to disturb the court's determination that the verdict did not shock its sense of justice, where the evidence overwhelmingly proved Haines' guilt notwithstanding his absence from the crime scene. Accordingly, Haines' second issue merits no relief.

In his third issue, Haines argues that the trial court abused its discretion in admitting Detective Daly's expert testimony concerning vernacular terms used in Philadelphia criminal transactions. We review a trial court's evidentiary rulings to determine whether the court abused its discretion. *See Commonwealth v. Smith*, 325 A.3d 513, 518 (Pa. 2024). "An abuse of discretion is not simply an error of judgment, but is an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality." *Id*. at 519.

Pennsylvania Rule of Evidence 702 governs a trial court's admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and

(c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702(a)-(c).

"[T]he standard for qualifying as an expert is a liberal one and the witness need only have any reasonable pretension to specialized knowledge on the subject matter under investigation and the weight to be given to the expert's testimony is for the factfinder." *Commonwealth v. Jones*, 240 A.3d 881, 890 (Pa. 2020) (quotation marks and citation omitted). "[E]xpertise, whether acquired as a result of formal education or by experience, is expertise." *Id*. (citation omitted).

Haines argues that the trial court abused its discretion in qualifying Detective Daly as "an expert in the field of vernacular used in criminal transactions in the City of Philadelphia" when he did not demonstrate during *voir dire* a specialized knowledge beyond that possessed by a layperson. N.T., 8/9/22, at 141. Haines further contends the trial court should have excluded Detective Daly's expert testimony did not satisfy the *Frye* test for admission of scientific evidence and that the detective's area of expertise was so vague and overbroad to constitute a due process violation.

In its opinion, the trial court found that Detective Daly demonstrated a specialized knowledge "regarding the various phrases, acronyms, and jargon used by [Philadelphia] criminals in their communication." Trial Court Opinion, 1/22/24, at 22. The court noted Detective Daly's testimony regarding his twenty-two years of experience as a Philadelphia police officer, his

investigation of various types of crimes throughout the City of Philadelphia, and his frequent review of text and social media messages during these investigations. **See id**. at 21-22. The court further concluded that Haines waived his **Frye** argument by not raising it below, but in any event, **Frye** was inapplicable because Haines' expertise was in a non-scientific field. **See id**. at 22-23.

Based on our review, we conclude that Haines has waived his challenges to Detective Daly's expert testimony. First, Haines did not raise a **Frye** challenge or argue that Detective Daly's expert testimony violated his due process rights at any point prior to the filing of his Pa.R.A.P. 1925(b) concise statement. Accordingly, Haines has waived these arguments. **See** Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal"); **see also Commonwealth v. Arroyo**, 723 A.2d 162, 170 (Pa. 1999) (holding that defendant waived a **Frye** challenge when he only objected to an expert's qualifications); **Commonwealth v. Cline**, 177 A.3d 922, 927 (Pa. Super. 2017) (stating that "issues, even those of constitutional dimension, are waived if not raised in the trial court") (citation omitted).

Second, Haines waived a challenge to Detective Daly's qualifications to opine on the meaning of vernacular used in the text messages. We note he did raise this claim in a pre-trial written motion *in limine*. **See** Haines' Motion In Limine, 8/4/22, at 7-9 (unnumbered). However, at oral argument on the motion *in limine*, the trial court expressly reserved any decision on Detective

Daly's qualifications until the Commonwealth offered him as an expert at trial. **See** N.T., 8/9/22, at 26-27 (stating that "the Commonwealth would be well advised to qualify" Detective Daly and the court was "reserv[ing] decision on [the detective's qualifications] until [the court] hear[s] from him"). Therefore, in the absence of a definitive ruling by the court on Haines' challenge to Detective Daly's qualifications, Haines was required to renew his objection at trial. **See** Pa.R.E. 103(b) (providing that "[o]nce the court rules definitively on the record — either before or at trial — a party need not renew an objection or offer of proof to preserve a claim of error for appeal"). Haines did not renew an objection at the time that the trial court accepted Detective Daly as an expert, and therefore Haines waived his challenge to Detective Daly's qualifications. **See id**.; **see also Commonwealth v. Rogal**, 120 A.3d 994, 1004 (Pa. Super. 2015) (finding that appellant waived challenge to expert witness where he did not object to expert's qualifications at trial); **Blumer v. Ford Motor Co.**, 20 A.3d 1222, 1232 (Pa. Super. 2011) (holding that "if the trial court defers ruling on a motion *in limine* until trial, the party that brought the motion must renew the objection at trial or the issue will be deemed waived on appeal").

Even if Haines had not waived his challenge to Detective Daly's qualifications, we would conclude that he has not shown an abuse of discretion by the trial court. Detective Daly testified that he had experience with numerous investigations involving the interpretation of vernacular terminology used by Philadelphia criminals during his twenty-two years of

experience in Philadelphia as a patrolman, detective in the Special Investigations Unit, and a homicide detective. **See** N.T., 8/9/22, at 100-01, 135. Detective Daly stated that in recent years, "everything began to revolve around information obtained through phones" and he had reviewed tens of thousands of pages of electronic messages gathered from suspects' phones and social media accounts. **See id**. at 135-38. Detective Daly indicated that he learned during those investigations the various phrases, acronyms, and jargon used by criminals and that the language employed by the criminals was consistent across the City of Philadelphia. **See id**. at 136, 139-41. This testimony established that Detective Daly had specialized knowledge beyond the average layperson that assisted the jury in understanding the vernacular terms within the text messages introduced at trial. **See, e.g.**, **Commonwealth v. Kinard**, 95 A.3d 279, 288-89 (Pa. Super. 2014) (*en banc*) (affirming qualification of police officer as expert to assist in deciphering jargon used in drug transactions); **see also Jones**, 240 A.3d at 890 (stating that a witness may acquire expertise by formal education or by experience). Therefore, no relief would be due on Haines' third issue.

In his fourth issue, Haines challenges the admission of the YouTube rap video of Haines allegedly rapping about the murder and a transcription of the lyrics.[7] Haines argues the Commonwealth did not authenticate the video, the

---

[7] In the portion of the video played at trial, Haines rapped as follows:

I'm too viable in theses streets that's why I hire n[----]s

*(Footnote Continued Next Page)*

Commonwealth breached the mandatory discovery required set forth in Pa.R.Crim.P. 573(B)(1) by disclosing the video on the eve of trial, and that the video was unfairly prejudicial.

"Pennsylvania Rule of Evidence 901 requires authentication prior to admission of evidence." *Commonwealth v. Orr*, 255 A.3d 589, 595 (Pa. Super. 2021). Pursuant to Rule 901(a), "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa.R.E. 901(a). The proponent may satisfy the authentication standard through various means, including circumstantial evidence of the "contents . . . or other distinctive characteristics of the item" or "[a]n opinion identifying a person's voice." Pa.R.E. 901(b)(4), (5). As this Court has explained, "[a]uthentication generally entails a relatively low burden of proof." *Commonwealth v. Murray*, 174 A.3d 1147, 1157 (Pa. Super. 2017) (citation omitted).

---

Fuck a watch and chain
Every 20K I'm buying killas
Put them on a mission they won't miss because I fire n[----]s
N[----]s want impression and they bitched up
Well now they plotted n[----]s
N[----] I dig 'em up, put that boy in the ground, he ain't getting up
They gotta check on my head but that shit is not big enough
N[----]s not lit enough, I didn't get hit enough
I understand the shooters, I used to be one
So I understand what they going through, so I feed them

Exhibit C-60.

Relevance is the threshold for the admissibility of evidence. *See* Pa.R.E. 402. A court may exclude otherwise relevant evidence if the danger of unfair prejudice outweighs its probative value. *See* Pa.R.E. 403. However, the mere harmfulness of evidence to a criminal defendant does not justify its exclusion. *See Commonwealth v. Kouma*, 53 A.3d 760, 770 (Pa. Super. 2012) (noting that "[e]xclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based on something other than the legal propositions relevant to the case") (citation omitted). The court need not sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand. *See id*.

This Court has recognized that rap lyrics are a form of artistic expression which "may employ metaphor, exaggeration, and other artistic devices, and can involve abstract representations of events or ubiquitous storylines." *Commonwealth v. Talbert*, 129 A.3d 536, 541 (Pa. Super. 2015) (citation omitted). However, "these features do not exempt such writings from jury consideration where the lyrics describe details that mirror the crime charged." *Id*. (citation and brackets omitted). Accordingly, "the courts of this Commonwealth have permitted the admission of rap lyrics where the content of those lyrics sufficiently dovetailed with real-world events and persons, so as to dispel the risk that the lyrics were purely fictional." *Commonwealth v. Lehman*, 275 A.3d 513, 521 (Pa. Super. 2022). Nevertheless, the fact that rap lyrics do not exactly duplicate real-life criminal events does not preclude their admission at trial. *See Talbert*, 129 A.3d at 541 (stating that it "would

be wholly unreasonable" to "expect rap lyrics" admitted as evidence of a criminal act "to communicate [that] criminal event in precise detail").

Haines argues that the trial court improperly admitted the rap video and lyrics of the song when the Commonwealth did not present anyone familiar with Haines' voice or the creation of the video. According to Haines, the identification of "Crakk" as a rapper featured in the video was insufficient for authentication purposes, particularly where the video did not appear on YouTube until six months after Haines' arrest on the present charges. *See* N.T., 8/10/22, at 92-93. Haines avers that the court abused its discretion by admitting the video where the lyrics bore only a "tenuous and unfounded" relevance to the shootings that were the subject of trial and the violent themes portrayed in the lyrics highly prejudiced Haines by "burn[ing] into [the jury's] minds that [he] must be a murderer." Haines' Brief at 34, 36. Haines further contends that the trial court should have excluded the video and lyrics pursuant to Rule 573(B)(1) because the Commonwealth produced the video on the eve of trial, depriving him of the ability to investigate and defend against it. *See* N.T., 8/8/22, at 37 (prosecutor stating that Detective Daly discovered the rap video the weekend before trial); *see also* Pa.R.Crim.P. 573(B)(1) (listing categories of evidence that the Commonwealth must disclose to the defense).

Upon review, the trial court concluded that the Commonwealth properly authenticated the rap video and lyrics based on the fact that the video listed "Crakk" as the featured artist on the track and the overlap between the

content of the lyrics and the Commonwealth's proof at trial.[8]  The court observed that the jury also had the opportunity to view, alongside the rap video, an excerpt of a YouTube video interview that Haines recorded for an entertainment channel where he introduced himself as "Crakk."  *See* Exhibit C-58.  The court further determined that the relevance of the rap video outweighed any danger of unfair prejudice where the "lyrics exactly mirrored the crime[s] for which [Haines] was charged," which "dispel[led] the risk that the lyrics were purely fictional."  Trial Court Opinion, 1/22/24, at 26-27.  Finally, the court found that Haines waived his challenge to the late disclosure of the rap video by not raising the discovery issue at trial.

Based on our review, we find no abuse of discretion in the trial court's admission of the rap video and lyrics at trial.  We first agree with the trial court that Haines waived his discovery issue, by not raising it below.  *See* Pa.R.A.P. 302(a).[9]

---

[8] In its opinion, the trial court applied Rule 901(b)(11), pertaining to authentication of digital evidence.  *See* Trial Court Opinion, 1/22/24, at 24-25; *see also* Pa.R.E. 901(b)(11) (setting forth standard for authentication of digital evidence).  However, while the rap video appeared in an electronic medium, YouTube, it is more akin to a traditional music recording rather than a social media post, text message, or other form of electronic communication that Rule 901(b)(11) primarily addresses.  *See* Pa.R.E. 901, *comment* (defining digital evidence to include "emails, text messages, social media postings, and images").  Therefore, we apply the general standard for authentication under Rule 901, rather than the rule specific to digital evidence.

[9] Haines cited the late disclosure of the rap video in his mid-trial motion for a mistrial.  *See* N.T., 8/10/22, at 7-10.  However, that motion did not adequately preserve a discovery violation claim, where: (1) Haines did not

*(Footnote Continued Next Page)*

Next, turning to authentication, we conclude that the trial court did not abuse its discretion in finding that the Commonwealth adequately authenticated the rap video and lyrics. *See Smith*, 325 A.3d at 518. The video contained distinctive characteristics that circumstantially linked Haines to the video. *See* Pa.R.E. 901(b)(4). "Crakk" was a featured artist on the rap video, and the Commonwealth admitted ample evidence at trial showing that Haines regularly used that nickname. *See, e.g.*, N.T., 8/9/22, at 144 (Commonwealth presenting a text message from Haines stating, "This [is] Crakk," to a contact identified in his phone as "B"). Additionally, as discussed further *infra*, the lyrics of the rap song contain marked similarities to the shootings of Eldridge and Ortiz. Moreover, Detective Daly opined that the voice on the rap video was identical to Haines' voice heard on the interview video and on Haines' voice messages, which the Commonwealth played at trial. *See* N.T., 8/10/22, at 91; *see also* Pa.R.E. 901(b)(5) (stating that evidence may be authenticated through "[a]n opinion identifying a person's voice — whether heard firsthand or through mechanical or electronic transmission or recording — based on hearing the voice at any time under circumstances that connect it with the alleged speaker"); N.T, 8/9/22, at 178-

_____

argue that the Commonwealth violated its discovery obligations; (2) he did not cite Rule 573; (3) the late disclosure of the videos was only one among various alleged lapses by the Commonwealth that Haines argued contributed to his inability to prepare an adequate defense; and (4) the relief Haines sought of a mistrial is not one explicitly authorized by Pa.R.Crim.P. 573(E).

79, 182 (Commonwealth playing voice messages Haines sent to Page's phone).

While Haines attempts to call into question the authenticity of the rap video based on the fact it was uploaded after his arrest, we note that Detective Daly's testimony established that "Crakk" was a featured artist on the track and a different artist, "Leaf Ward," posted it to YouTube. *See* N.T., 8/10/22, at 85. In any event, any question Haines raised concerning the timing of the video goes to its weight, not admissibility. Here, the Commonwealth offered sufficient evidence to surmount the "low burden of proof" to admit the rap video and lyrics under Rule 901, and therefore we discern no basis to overturn the trial court's authentication ruling. *Murray*, 174 A.3d at 1157 (citation omitted).

We also see find no abuse of discretion in the trial court's ruling that the rap lyrics "sufficiently dovetailed with real-world events" and were not unfairly prejudicial. *Lehman*, 275 A.3d at 521. The lyrics contain multiple references to "hir[ing]," "feed[ing]," and "buying killas" or "shooters" and "put[ting] them on a mission." Exhibit C-60. The sum of "20K" referenced in the lyrics is the exact amount that the Commonwealth proved Haines paid Page to shoot Eldridge and Ortiz on February 17, 2020. *Id*. Further, the lyrics reference a completed contract killing. *See id*. (stating that rapper "put that boy in the ground, he ain't getting up"). While the admission of the lyrics may have been prejudicial, Haines has not shown that the lyrics were so inflammatory that they would lead the jury to render a verdict based on something other than

the legal propositions relevant to this case. ***See Kouma***, 53 A.3d at 770 (stating that trial court need not "the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand") (citation omitted).

Therefore, we discern no abuse of discretion in the trial court's admission of the rap video and lyrics. ***See Talbert***, 129 A.3d at 541 (concluding that defendant's rap video was relevant to show his involvement in murders based on references to the neighborhood of the shooting, the type of gun used, the shooting of one of the victims in the legs, and the escape vehicle, notwithstanding some inconsistencies between the lyrics and real-life events); ***Commonwealth v. Flamer***, 53 A.3d 82, 89 (Pa. Super. 2012) (holding that the trial court abused its discretion by finding defendant's rap lyrics to be irrelevant and prejudicial, where lyrics about people "keeping their mouths shut," sending his friends to kill for him, and "popping shells" in people that "run their mouth" tended to show a conspiracy to kill the Commonwealth's key witness before trial). Haines' fourth issue thus merits no relief.

In his fifth and final issue, Haines argues that the trial court abused its discretion by granting the Commonwealth's motion to allow the introduction of the other bad acts evidence related to the shooting of Kevin Ortiz.

Pursuant to Rule of Evidence 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the

character." Pa.R.E. 404(b)(1). However, such other bad acts evidence may be admissible when relevant for other purposes, including to establish

> a common scheme, plan, or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others or to establish the identity of the person charged with the commission of the crime on trial—in other words where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.

*Commonwealth v. Carter*, 320 A.3d 140, 149 (Pa. Super. 2024) (citation and brackets omitted); *see also* Pa.R.E. 404(b)(2).

Pennsylvania law additionally recognizes the *res gestae* exception to Rule 404(b)'s general proscription, which allows the introduction of bad acts evidence to tell "the complete story" of the charged criminal episode. *Carter*, 320 A.3d at 149 (citation omitted). "Other acts evidence is admissible under the *res gestae* exception where it formed a part of a chain, or was one of a sequence of acts, or became part of the history of the event on trial, or was part of the natural development of the facts." *Id*. (citation and quotation marks omitted). "In a criminal case [other bad acts] evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

Haines argues that the trial court abused its discretion in allowing the evidence related to the Ortiz shooting, where the Commonwealth showed no nexus with the Eldridge murder. Haines notes that the shootings did not occur in close proximity to one another and argues that "there is little sense to 'take

over' blocks that are so far apart and in different neighborhoods." Haines' Brief at 38. Haines avers that "if there were truly a nexus between the two shootings then the Commonwealth would have charged [him] for the Ortiz shooting, as well." *Id*. Haines asserts that "the Commonwealth did not need to introduce evidence of other non-charged criminal conduct, as the texts could be separated, and the texts pertaining to the other shooting were not needed to prove the instant offense." *Id*. In the absence of a sufficient nexus, Haines contends that the evidence of the other shooting had the improper effect of showing his propensity for criminal conduct and was unfairly prejudicial.

In support of its decision to allow the other bad acts evidence, the trial court reasoned that evidence related to the two shootings were "inextricably intertwined" and "part of a broader conspiracy" such that evidence related to the Ortiz shooting tended to prove Haines' involvement in Eldridge's murder. Trial Court Opinion, 1/22/24, at 30-31. The court explained that "the admission of evidence of Ortiz's shooting was essential for a coherent explanation of the conspiratorial relationship between [Haines] and Page, as well as the events that occurred before and after Eldridge's homicide." *Id*. at 32. The court additionally observed that it instructed the jury to only consider the Rule 404(b) evidence for the proper purpose, which limited the potential for unfair prejudice. *See* N.T., 8/11/22/, at 53-54.

Based on our review, we discern no abuse of discretion in the trial court's admission of the other bad acts evidence. The Ortiz shooting was committed

within four hours of Eldridge's murder and related to the same conspiracy to kill or harm Eldridge, Ortiz, and others who were part of a drug gang that controlled the intersection of 18th and Tioga Streets in Philadelphia. *See* N.T., 8/9/22, at 107, 149-50, 153, 168, 171-72, 183-88; N.T., 8/10/22, at 111-12. Haines and Page began discussing 7th Street — the location of the Ortiz shooting — two days prior to the shootings, and within an hour of Eldridge's murder, Page text messaged Haines that he "need[ed] 7 Street." *See* N.T., 8/9/22, at 171-72, 180.

Page's message to Haines immediately after shooting Ortiz, referencing a "double double," further confirmed that the two shootings were related. *See id*. at 187 (Detective Daly explaining that a "double double" is the act of achieving ten points in two different categories in the same basketball game and here represented "two shootings that day"). Haines and Page discussed the amount of payment for the two shootings later that evening, and Haines delivered payment to Page the following day. *Id*. at 197-98, 201.

The record thus reflects the Eldridge murder and attempted murder of Ortiz were part of a common criminal scheme to eliminate Haines' rivals, and the circumstances of the two shootings were so intertwined that the events of the Ortiz shooting formed part of the history of the present case. *See Carter*, 320 A.3d at 149. Furthermore, the trial court's cautionary instruction to the jury was sufficient to ameliorate any undue prejudice resulting from the admission of that evidence. *See Commonwealth v. Sherwood*, 982 A.2d 483, 497-98 (Pa. 2009) (holding that the giving of cautionary instructions was

sufficient to overcome prejudice resulting from admission of other bad acts evidence). While Haines attempts to focus our attention on whether the Commonwealth could have proved its case without the Ortiz evidence and the alleged absence of charges against Haines for the Ortiz shooting, these factors are irrelevant to our analysis of whether the trial court abused its discretion in allowing the bad acts evidence. As we conclude that the court did not commit an abuse of discretion, no relief is due on Haines' final issue.

Having found no merit to any of Haines' appellate issues, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/24/2025